**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| GREGORY BITTERMAN, on his own behalf and on behalf of all others similarly situated, | : : : |
| Plaintiff, | : : Case No. |
| v. | : : **JURY TRIAL DEMANDED** |
| MOBILE FIDELITY SOUND LAB, INC. and AUDIOPHILE MUSIC DIRECT, INC., | : : : |
| Defendants. | : : |

## CLASS ACTION COMPLAINT

Plaintiff Gregory Bitterman ("Plaintiff") brings this Class Action Complaint against Defendants Mobile Fidelity Sound Lab, Inc. ("Mobile Fidelity" or "Defendant") and Audiophile Music Direct, Inc. ("Music Direct" or "Defendant"), individually and on behalf of all others similarly situated, and complains and alleges upon personal knowledge as to his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by Plaintiff's attorneys:

## NATURE OF THE ACTION

1.      This is a civil class action lawsuit brought by Plaintiff on behalf of all consumers who purchased Defendants' vinyl records sold as Limited Edition Ultradisc One-Step recordings ("UD1S Products" or the "Products").

2.      For years, Defendants have falsely advertised the UD1S Products as genuine analog recordings while falsely omitting the existence of a digital step in Defendants' proprietary mastering chain.

3.      Defendants' misrepresentation implicates the core value of the UD1S Products because the purity of the all-analog record-making process is important to Plaintiff, class members, and the audiophile[1] community.

4.      Analog music represents the actual, continuous sound waves generated by the artists and their equipment, recorded as grooves on vinyl.

5.      Since analog records are cut directly from the original master tapes, only a limited number of analog recordings can be made because the analog master tapes deteriorate each time they are used to produce a lacquer, which is then used to press records. Only 2,500 to 10,000 quality records can be produced each time the analog master tape must is used. As a result of this built-in scarcity, pure analog records are highly collectible and much more valuable compared to records made from digital master recordings.

6.      During the class period, the cost of a single UD1S Product ranged from $99 to $125. Plaintiff and class members were willing to pay elevated prices because they trusted the accuracy and reliability of Defendants' representations that the UD1S Products were purely analog recordings with no digital mastering involved.

7.      But now the truth has been exposed and Defendants have admitted that the Products are not "all analog" and instead incorporate direct stream digital ("DSD") technology.

8.      Vinyl records that are made using digital mastering such as DSD technology are worth about $30 each, which is much less than the UD1S Products were sold.

9.      If Defendants had not misrepresented that the UD1S Products were all analog recordings, or if Defendants had been honest about their use of DSD technology, Plaintiff and class

---

[1] For the purpose of this Complaint, an "audiophile" simply means someone who is enthusiastic about high fidelity music reproduction and is not meant to connote any degree of expertise in music.

members would not have purchased the UD1S Products or would have paid significantly less for them.

10.     Plaintiff, like other consumers nationwide, purchased UD1S Products based on the express and/or implied representations made by Defendants that the UD1S Products were all analog with no digital production step.

11.     Defendants have engaged in unfair and deceptive business practices by intentionally misrepresenting the nature and quality of their UD1S Products and by charging an exorbitantly high price premium.

12.     Plaintiff and members of the Proposed Class were injured by Defendants false, fraudulent, unfair, deceptive, and misleading practices.

13.     Accordingly, Plaintiff seeks compensatory damages, restitution, and equitable remedies for himself and members of the Proposed Classes and asserts causes of action as follows: (a) violation of Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*; (b) breach of express warranty; (c) breach of implied warranty; (d) violation of New York's consumer protection and false advertising statutes, N.Y. Gen. Bus. Law §§ 349, 350; (e) common law fraud; and (f) unjust enrichment.

## THE PARTIES

14.     Plaintiff Gregory Bitterman is an adult individual residing in Great Neck, New York and is a citizen of the State of New York.

15.     Defendant Mobile Fidelity Sound Lab, Inc. is a record label that specializes in the production of reissued vinyl LP records using all analog technology. Mobile Fidelity also sells vinyl records, compact discs, and Super Audio CDs that are produced using digital technology. Defendant Mobile Fidelity is an Illinois corporation with corporate headquarters at 1811 W. Bryn

3

Mawr Avenue, Chicago, IL 60660. Mobile Fidelity's studio and mastering facilities are located at 105 Morris Street, #145 in Sebastopol, CA 95472. Upon information and belief, Defendant Mobile Fidelity designed, manufactured and advertised the UD1S Products that are the subject of this lawsuit and that were sold to consumers throughout the United States, including in New York.

16.     Defendant Audiophile Music Direct, Inc. is a Nevada corporation specializing in the sale of audio equipment with headquarters at 1811 W. Bryn Mawr Avenue, Chicago, IL 60660. Upon information and belief, Music Direct is the parent company of Mobile Fidelity and Music Direct marketed and sold the UD1S Products that are the subject of this lawsuit.

17.     At all times material hereto, Defendants were acting by and through their duly authorized agents, servants, workmen, or employees acting within the course and scope of their employment and on the business of said employer.

## JURISDICTION

18.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than Defendants.

19.     The Court has personal jurisdiction over Defendant Mobile Fidelity because Defendant is incorporated in Illinois and maintains its principal place of business in Illinois.

20.     The Court has personal jurisdiction over Defendant Music Direct because Defendant maintains its headquarters in Chicago, Illinois and because Defendant has transacted, solicited, and conducted business in Illinois through employees, agents, and/or sales representatives, and derived substantial revenue from such business in Illinois.

21.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction here and regularly conduct business in the Northern District of Illinois, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

**FACTS**

**A.     Analog versus digital is a critical distinction in the marketplace of vinyl records.**

22.    The process for making a vinyl record from the original master recording is expensive and time consuming.

23.    For any piece of music, the first step is to obtain a license for the original master tape from the label that owns it.

24.    The original master tape can be converted back to electrical signals that can be cut into vinyl using a lathe.

25.    Vinyl records made this way are considered all analog, and it is believed they preserve the entire dynamic range of sound from the original.

26.    Vinyl records pressed directly from the analog master tapes represent the closest replica possible from the original musical recording.

27.    Moreover, since original master tapes deteriorate over time, the master tapes cannot be played repeatedly because they are microscopically damaged on every play back.

28.    Since licenses will only allow master tapes to be played a set number of times, the quantity of vinyl records that can be pressed using an analog process is necessarily limited.

29.    All analog releases are usually limited to fewer than 10,000 copies.

30. By contrast, digital recordings are easier and cheaper to produce compared to all analog. Once a digital copy is made, it can be reproduced indefinitely, so there is no scarcity problem like there is for vinyl records cut from analog.

31. Digital recordings are made by taking snapshots of the audio at given intervals and the files can thereafter be compressed and edited.

32. For example, if a digital recording contains at least 40,000 samples or snapshots per second — and CDs use 44,100 samples per second — the final product is said to have reconstructed the original music on continuous waveform up to the limits of human hearing (frequencies up to 20,000 Hz). Some believe this is not true and can distinguish an analog recording from a digitally source recording of the same material. That is the reason the vinyl record has resurfaced in a digital world and companies like the defendants are profiting from the individuals who has hear the difference and afford the more expensive analog product.

33. For some audiophiles, the experience of hearing the sound quality and comparing music remastered as all analog versus digital is part of what makes the hobby enjoyable.

34. For consumers to have meaningful and worthwhile experiences with their music, sellers such as Defendants must be truthful about the Products they are selling in the marketplace.

35. Defendants Mobile Fidelity and Music Direct were not honest about the UD1S Products. Defendants exploited the marketplace and contaminated the debate of analog versus digital when they sold vinyl records as all analog when in reality the UD1S Products were made using digital technology.

**B.      Defendants purposely mislabeled, misrepresented, and falsely sold their UD1S Products for years.**

36. Defendants have known for years that there is a material difference between records that are all analog and records that use digital technology.

6

37.     In addition to the above, this difference is evident from Mobile Fidelity's website, which distinguishes between records they create and sell using digital sourcing and records that are purely analog, and explains the immense value associated with analog records.

38.     Specifically, Mobile Fidelity believes that "mastering systems should . . . unveil all detailed musical information on the original master recording without adding deterioration, coloration or other sonic artifacts." It is believed by many that any introduction of a digital component into the process will introduce sonic artifacts.

39.     To uphold their essential belief that "extraordinary sound quality matters most," Mobile Fidelity introduced their UD1S Products in 2016, which they explained were "created for the ultimate in sound quality."

40.     All UD1S Products are generated using Mobile Fidelity's proprietary Gain 2$^{TM}$ Ultra Analog$^{TM}$ System, a system Mobile Fidelity pioneered to revolutionize audio technology and press pure analog records, as indicated by the name of the technology itself.

41.     Mobile Fidelity explicitly told consumers that, when using the Gain 2$^{TM}$ Ultra Analog$^{TM}$ System, they "only utilize first generation original master recordings as source material for [their] releases."

42.     Mobile Fidelity reiterated this sentiment when describing the UD1S one-step process on its website and on the UD1S records themselves.

43.     Specifically, to cut a set of lacquers using only one step, Mobile Fidelity confirmed on its website and in the materials that come with the UD1S records, that they begin the mastering process "with the original master tapes." Mobile Fidelity then use the lacquers "to create a very fragile, pristine UD1S stamper called a 'convert.'" Mobile Fidelity further explained that the "[d]elicate 'converts' are then formed into the actual record stampers."

44.     Through their one-step mastering process, Mobile Fidelity purported, and Plaintiffs and the Class believed, that the UD1S Products that Mobile Fidelity reissues and labels as purely analog derive from original master recordings that are converted to analog copies in a singular step.

45.     Nowhere in Mobile Fidelity's marketing materials, including on its website or on the records themselves, did Mobile Fidelity mention that the one-step mastering process involves digital processing or more than one step.

46.     The one-step process is depicted in the below image, which Mobile Fidelity displayed prominently on both its website and on the materials that came with each of its UD1S records from 2016 to June 2022.



47.     Mobile Fidelity maintains that the one-step process is superior to the industry standard, three-step lacquer process, because it "bypass[es] two processes of generational loss."

48.     According to Mobile Fidelity, "[t]he removal of the two additional steps of generational loss in the plating process reveals tremendous amounts of extra musical detail and dynamics, which are otherwise lost due to the standard copying process."

49.     Mobile Fidelity further "ensure[s] optimum sound quality by strictly limiting the number of pressings printed for each [UD1S Product] release." In doing so, Mobile Fidelity guarantees "that the quality of the last pressing matches the quality of the first."

50. Mobile Fidelity thus insists that the UD1S Products that ultimately result "serve[] as an immaculate replica of the lacquer sourced directly from the original master tape." Under this notion, Mobile Fidelity has even gone as far as designating its UD1S Products as both "limited edition" and "collectors' items."

51. Mobile Fidelity therefore knew of the immense value associated with their UD1S products because these records, as Mobile Fidelity described throughout their marketing materials, including on their website and on the records themselves, mirror the original master recording, exhibit an enhanced musical quality well beyond that of records that derive from digital sourcing, and maintain exclusivity due to the limited number of copies pressed for each album.

52. Within the audiophile community on social media, including YouTube, Mobile Fidelity and its engineers continually spread the lie that the UD1S Products were all analog.

53. With knowledge of the increased value of purely analog records, Mobile Fidelity purposefully labeled their UD1S Products as such and immensely capitalized on the distinction between records that are digitally sourced and records that are purely analog at the expense of Plaintiff and the Class.

## C. Defendants' misrepresentations caused consumers to pay a substantial price premium for the UD1S Products

54. Because of the "exclusive nature" of the "limited" UD1S pressings, and Mobile Fidelity's knowledge of the enhanced musical value associated therewith, Mobile Fidelity sold the UD1S records at a premium.

55. Compared to the digitally sourced records that Mobile Fidelity sells on its website for approximately $30 each, Mobile Fidelity sold their UD1S records between $99 and $125 each.

56. As a result, consumers who purchased UD1S records, including Plaintiff and the Class, paid an immense premium on the UD1S Products that Mobile Fidelity falsely represented as purely analog records cut using only "one-step."

57. Upon information and belief, the below chart depicts the UD1S records that Mobile Fidelity sold out between 2016 and 2022, along with the number of records pressed, the price, Mobile Fidelity's sales revenue, and the premium paid on the Products by Plaintiff and the Class.

| Artist | Title | Number Pressed | Price | Sales Revenue | Premium Paid |
|---|---|---|---|---|---|
| Santana | *Abraxas* | 2,500 | $99.99 | $249,975 | $175,000 |
| Bill Evans | *Sunday at the Village Vanguard* | 3,000 | $99.99 | $299,970 | $210,000 |
| Donald Fagen | *The Nightfly*[2] | 6,000 | $99.99 | 599,940 | $420,000 |
| Simon and Garfunkel | *Bridge Over Troubled Water* | 7,500 | $99.99 | $749,925 | $525,000 |
| Marvin Gaye | *What's Going On* | 7,500 | $125 | $937,500 | $712,575 |
| Stevie Ray Vaughan | *Texas Flood* | 7,000 | $125 | $875,000 | $665,070 |
| Bill Evans Trio | *Portrait in Jazz* | 6,000 | $99.99 | $599,940 | $420,000 |
| Bob Dylan | *Blood on the Tracks* | 9,000 | $125 | $1,125,000 | $855,090 |
| Thelonious Monk | *Monk's Dream* | 6,000 | $125 | $750,000 | $570,060 |
| Yes | *Fragile* | 7,500 | $125 | $937,500 | $712,575 |
| Charles Mingus | *Mingus Ah Um* | 6,000 | $125 | $750,000 | $570,060 |

---

[2] While, upon information and belief, this record was originally recorded using digital technology, the master tape utilized by Mobile Fidelity to reissue the record derived from an analog copy of the digital master copy. Therefore, Mobile Fidelity polluted the record by adding a second digital step.

| Janis Joplin | *Pearl* | 10,000 | $125 | $1,250,000 | $950,100 |
|---|---|---|---|---|---|
| Blood, Sweat & Tears | *Blood, Sweat & Tears* | 6,000 | $125 | $750,000 | $570,060 |
| Carole King | *Tapestry* | 10,000 | $125 | $1,250,000 | $950,100 |
| Paul Simon | *Still Crazy After All These Years* | 8,000 | $125 | $1,000,000 | $760,080 |
| Eagles | *Eagles* | 7,500 | $125 | $937,500 | $712,575 |
| Eagles | *Desperado* | 7,500 | $125 | $937,500 | $712,575 |
| Muddy Waters | *Folk Singer* | 10,000 | $125 | $1,250,000 | $950,100 |
| Eric Clapton | *Unplugged* | 10,000 | $125 | $1,250,000 | $950,100 |
| | | | **Total Sales Revenue** | **$16,499,750** | |
| | | | **Total Premium Paid** | | **$12,391,120** |

58. Upon information and belief, the total premium paid on Mobile Fidelity's UD1S Products by Plaintiffs and consumers alike amounts to more than $12 million, if not more.

59. Upon information and belief, the total premium paid by Plaintiffs and consumers alike represents seventy-five percent (75%) of Mobile Fidelity's total known sales revenue of their UD1S Products.

60. By paying a seventy-five percent (75%), if not larger, premium on Mobile Fidelity's UD1S Products that they falsely represented as purely analog recordings created using one-step, Plaintiffs and the Class were harmed by Defendants.

61. Had Plaintiff and the Class known that the UD1S Products were not purely analog, as marketed by Mobile Fidelity from 2016 to 2022, they would not have purchased the product, or would have paid less for it.

**D.**    **Following Years of Deception, Mobile Fidelity Finally Admits to Using Digital Processing in its UD1S Products.**

62.    In early July 2022, Mobile Fidelity engineers revealed that the company utilizes a digital step in the production of its records.

63.    Shortly thereafter, Jim Davis, president of Mobile Fidelity, issued a statement confirming the above, and stated that its UD1S Products utilized a digital step, contrary to the prior marketing scheme it set forth since 2016.

64.    Specifically, Jim Davis explained that Mobile Fidelity allowed "false narratives to propagate" regarding the use of digital technology in their mastering chain, and specifically with the UD1S Product line.

65.    Despite admitting as such in July 2022, Mobile Fidelity never introduced on its website, on the UD1S records' packaging, or in any materials that accompanied each UD1S record that Mobile Fidelity utilized any form of digital processing, including DSD, in the production of its UD1S Products.

66.    In fact, despite admitting as such in July 2022, Mobile Fidelity actively continued to conceal the use of a digital step in the production of its UD1S Products.

67.    In response to a consumer complaint in 2020, for example, Mobile Fidelity, when questioned whether they incorporate any digital step in their mastering process, explicitly denied the use of digital processing on any records that bear the designation, "Original Master Recording," including UD1S Products that include the same.

12

> from: MOFI Customer Service <cs@mofi.com>
> date: 9 Oct 2020, 07:16
> subject: mastering question
> mailed-by: mofi.com
>
> Thank you for your email, *there is no analog to digital conversion in our vinyl cutting process.* Any product that bears the ORIGINAL MASTER RECORDING stripe on the jacket lets the customer know that the Original Master Tape was used to produce the release.

**E.    Plaintiff Bitterman purchased fourteen (14) UD1S Products between 2016-2022**

68.    Plaintiff Gregory Bitterman has been a music lover his whole life.

69.    As a consumer, he bought digital music until the resurgence of all analog vinyl was reintroduced.

70.    Plaintiff Bitterman reviewed the representations on Mobile Fidelity's website and on Music Direct's website regarding how the UD1S Products were made as pure analog recordings. Specifically, Plaintiff Bitterman reviewed the representations that the UD1S Products were made using "One Step," which by omitting the digital step meant to him the records were all analog. Plaintiff Bitterman reviewed and relied upon the representations that the UD1S Products were made using the "GAIN 2™ Ultra Analog™ System for Vinyl," which "only utilize[s] first generation original master recordings as source material." Plaintiff Bitterman understood these and other representations to mean the UD1S Products were all analog.

71. Plaintiff Bitterman has also reviewed and relied upon the representations contained on the labeling and envelope of the vinyl record as well as the written material that was included with each purchase of the UD1S Products.

72. Plaintiff Bitterman purchased the UD1S Products because he believed they were all analog.

73. Plaintiff Bitterman never saw any representations from Defendants disclosing that the UD1S Products were made using a digital step or DSD technology.

74. Between 2016 and 2022, Plaintiff Bitterman purchased the following UD1S Products:

| Artist | Title | Date Purchased | Purchase Price |
|---|---|---|---|
| Santana | Abraxas | 4/1/16 | $99 |
| Donald Fagen | The Nightfly | 8/14/17 | $99 |
| Marvin Gaye | What's Going On | 10/22/18 | $125 |
| Stevie Ray Vaughan | Texas Flood | 10/22/18 | $125 |
| Bob Dylan | Blood On The Tracks | 5/16/19 | $125 |
| Yes | Fragile | 9/20/19 | $124.99 |
| Stevie Ray Vaughan | Couldn't Stand The Weather | 7/27/20 | $125 |
| Blood, Sweat and Tears | Blood, Sweat and Tears | 12/13/20 | $124.99 |
| Janis Joplin | Pearl | 1/11/21 | $124.99 |
| Carole King | Tapestry | 2/26/21 | $124.99 |
| Paul Simon | Still Crazy After All These Years | 4/26/21 | $124.99 |
| Eagles | Desperado | 8/16/21 | $125 |
| Eagles | Eagles | 8/16/21 | $125 |
| Eric Clapton | Unplugged | 5/12/22 | $124.99 |

75. Plaintiff purchased the above UD1S Products by logging into his Music Direct account online and inputting his payment information. He had the UD1S Products shipped to him in New York.

14

76.     Prior to and at the time of purchasing the above UD1S Products, Plaintiff Bitterman reviewed and relied upon Defendants' representations that the UD1S Products were all analog and did not contain any digital step.

77.     Plaintiff Bitterman relied upon these representations and omissions when he purchased the above UD1S Products.

78.     If Plaintiff Bitterman had known that the UD1S Products were made using DSD technology, he would not have purchased the UD1S Products, or he would have paid much less for them.

79.     After Plaintiff Bitterman learned that the UD1S Products were not all analog, he cancelled existing orders for delivery of additional UD1S Products.

## CLASS ACTION ALLEGATIONS

80.     This action is being brought by Plaintiff as a Class Action pursuant to Federal Rule of Civil Procedure 23, on Plaintiff's own behalf and on behalf of a class of persons to which he belongs as defined below.

81.     Members of Plaintiff's Class are defined as follows:

**Nationwide Class**:

> All persons who purchased the UD1S Products in the United States during the applicable statute of limitations.

**New York Sub-Class**:

> All persons who purchased the UD1S Products in New York during the applicable statute of limitations.

82.     The following people are excluded from the class and the subclass: (a) any Judge or Magistrate Judge presiding over this action and the members of their family; (b) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the

Defendants or their parents have a controlling interest and their current employees, officers and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) Plaintiff's counsel and Defendants' counsel, and their experts and consultants; and (f) the legal representatives, successors, and assignees of any excluded persons.

**_Numerosity, Fed. R. Civ. P. 23(a)(1)_**

83.     The proposed classes contain members so numerous and geographically dispersed that separate joinder of each member of the class is impractical. The precise number of class members is unknown to Plaintiff, but may be ascertained from Defendants' records and, based upon publicly-available information, is thousands of individuals.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

**_Commonality, Fed. R. Civ. P. 23(a)(2); Predominance, Fed. R. Civ. P. 23(b)(3)_**

84.     There are questions of law or fact common to the proposed class, which predominate over any individual questions, including, but not limited to the following:

a.     Whether the UD1S Products are accurately labeled;

b.     Whether the marketing, advertising, and labeling of the UD1S Products is misleading to reasonable consumers;

c.     Whether Defendants represented that the UD1S Products were all analog;

d.     Whether Defendants failed to disclose that the UD1S Products incorporated DSD technology;

e.     Whether Defendants breached express and implied warranties;

16

f.      Whether Defendants violated state consumer protection laws;

g.      Whether Defendants committed fraud by selling the UD1S Products as all analog while concealing the fact that the UD1S Products were made using DSD technology;

h.      Whether Defendants were unjustly enriched;

i.      Whether Defendants charged a price premium for the UD1S Products;

j.      Whether Plaintiff and the other members of the Class and Subclass have suffered ascertainable monetary losses; and,

k.      Whether Plaintiff and the other members of the Class and Subclass are entitled to monetary remedies.

**Typicality, Fed. R. Civ. P. 23(a)(3)**

85.     Plaintiff's claims are typical of the proposed class members' claims. Like members of the proposed class, Plaintiff purchased Defendants' UD1S Products. Plaintiff's claims arise out of the same practices and course of conduct that gave rise to the other class members' claims.

**Adequacy of Representation, Fed. R. Civ. P. 23(a)(4)**

86.     The interests of the Class and Subclass will be fairly and adequately asserted and protected by the representative parties and their counsel. First, Plaintiff has no conflict of interest in the maintenance of the Class Action. Second, Plaintiff's counsel have decades of combined experience in handling and litigating consumer class action claims. Lastly, sufficient financial resources are available to assure that the interests of the Classes will be protected.

17

*Declaratory and Injunctive Relief, Fed. R. Civ. P. 23(b)(2)*

87.    Defendants have acted or refused to act on grounds generally applicable to Plaintiff's claims, which arise from the same practices and course of conduct that gave rise to the other class members' claims, making appropriate final injunctive relief and declaratory relief, as described herein, appropriate.

*Risk of Varying and Inconsistent Adjudications, Fed. R. Civ. P. 23(b)(1)*

88.    Adjudicating this controversy as a Class Action would be the fairest and most efficient method of resolution. Due to the large number of consumers who have suffered identical price premium losses, joinder of all would be impractical. Further, the prosecution of separate claims would most likely create varying or inconsistent adjudications and incompatible standards of conduct.  Lastly, common questions of law and fact predominate over any issues involving only individual Class members.

*Certification of Specific Issues, Fed. R. Civ. P. 23(c)(4)*

89.    To the extent a class does not meet the requirements of Rule 23(b) of the Federal Rules of Civil Procedure, Plaintiff seeks certification of issues that drive the litigation toward resolution on behalf of each of the classes Plaintiff seeks to represent.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Violation of Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.***
***Plaintiff, individually, and on behalf of all class members***

90.    Plaintiff incorporates by reference the facts and allegations contained in the foregoing paragraphs as though fully set forth hereinafter at length.

91.     As previously alleged, this Court has original jurisdiction over this matter based upon the requirements of CAFA; therefore, the Court has alternate jurisdiction over Plaintiff's Magnuson-Moss claim.

92.     The UD1S Products are consumer products as defined in 15 U.S.C. § 2301(1).

93.     Plaintiff and class members are consumers as defined in 15 U.S.C. § 2301(3) and utilized the UD1S Products for personal and household use and not for resale or commercial purposes.

94.     Plaintiff and class members purchased the UD1S Products costing more than $5 and their individual claims are greater than $25 as required by 15 U.S.C. § 2302(e) and 2310(d)(3)(A).

95.     Defendants are suppliers and warrantors as defined in 25 U.S.C. §§ 2301(4) and (5).

96.     The federal Magnuson-Moss Warranty Act ("MMWA" or "Act"), 15 U.S.C. §§ 2301-2312, is a consumer protection regime designed to supplement state warranty law.

97.     The MMWA provides a cause of action for breach of warranty, including the violation of express and implied warranty of merchantability, or other violations of the Act. 15 U.S.C. § 2310(d)(1).

98.     The Defendants have violated the implied warranties of merchantability by failing to provide merchantable goods. The UD1S Products are not merchantable or fit for their ordinary purpose because the UD1S Products are not all analog, but instead are made using DSD technology. Thus, a person seeking to buy an all-analog vinyl record who bought Defendants' UD1S Product is dissatisfied because the Products are not authentically all analog.

19

99.     Defendants violated the express warranty because they represented the UD1S Products were all analog when in fact they were made using digital technology.

100.     By Defendants' conduct as described herein, Defendants have failed to comply with their obligations under their implied promises, warranties, and representations.

101.     Plaintiff and class members fulfilled their obligations under the implied warranties and express warranties for the UD1S Products.

102.     As a result of Defendants' breach of warranties, Plaintiff and class members are entitled to revoke their acceptance of the Products, obtain damages, punitive damages, equitable relief, and attorneys' fees and costs pursuant to 15 U.S.C. § 2301.

**SECOND CLAIM FOR RELIEF**
**Breach of Express Warranty under Illinois Law**
***Plaintiff, individually, and on behalf of all class members***

103.     Plaintiff incorporates by reference herein the facts and allegations set forth in the foregoing paragraphs 1 through 89 as fully as though same were here set forth at length.

104.     Defendants marketed, sold, and/or distributed the Products, and Plaintiff and class members purchased the Products.

105.     The labeling, marketing, and advertising of the Products constitute express warranties and became part of the basis of the bargain and are part of the contract between Plaintiff and class members and Defendants.

106.     Defendants made specific warranties and representations by representing the process for making the UD1S Products as all analog. Plaintiff and class members relied on these representations at the time of purchase.

107.     For all of the Products, Defendants breached the express warranty stating that the Products were all analog because the Products were made using DSD technology.

108.    Plaintiff and class members performed all conditions precedent to Defendants' liability under the contract when they purchased the Products.

109.    As a direct and proximate result of Defendants' breaches of its express warranties and their failure to conform to the Products' express representations, Plaintiff and class members have been damaged. Plaintiff and class members have been damaged in that they did not receive the Products they specifically paid for and that Defendants warranted it to be. In addition, Plaintiff and class members paid a significant price premium for a product that did not conform to Defendants' warranties.

110.    On or about September 1, 2022, Plaintiff gave notice to Defendants that outlined Defendants' breaches of express warranty of the Products as described herein.

### THIRD CLAIM FOR RELIEF
**Breach of Implied Warranty Under Illinois Law**
***Plaintiff, individually, and on behalf of all class members***

111.    Plaintiff incorporates by reference herein the facts and allegations set forth in the foregoing paragraphs 1 through 89 as fully as though same were here set forth at length.

112.    Defendants sold each of the Products as all analog. The implied warranty for each of the Products was that they were all analog with no digital step.

113.    Defendants breached the implied warranty of merchantability for all of the Products because they were not all analog and instead were made using DSD technology. Plaintiff and class members bought the UD1S Products because they wanted vinyl records that were all analog. Since the Products are not all analog and instead contain a digital step, the Products failed to be of merchantable quality and fit for their ordinary use.

114.    As a direct and proximate result of Defendants' breaches of its implied warranties, Plaintiff and class members have been damaged. Plaintiff and class members have suffered

damages in that they did not receive the product they specifically paid for. In addition, Plaintiff and class members paid a significant price premium for a product that was not merchantable for ordinary use.

115. On or about September 1, 2022, Plaintiff gave notice to Defendants that outlined Defendants' breaches of implied warranty of the Products as described herein.

**FOURTH CLAIM FOR RELIEF**
**Violation of N.Y. Gen. Bus. Law § 349**
*Plaintiff, individually, and on behalf of all New York Subclass members*

116. Plaintiff incorporates by reference herein the facts and allegations set forth in the foregoing paragraphs 1 through 89 as fully as though same were here set forth at length.

117. Plaintiff brings this claim individually and on behalf of the other class members.

118. Plaintiff has standing to bring this claim individually and on behalf of the other class members because the underlying transactions at issue between Plaintiff and Defendants happened entirely, or predominantly, in New York. Plaintiff was situated in New York when he purchased the UD1S Products. The representations at issue were directed towards Plaintiff in New York, and, in exchange for payments routed from Plaintiff's New York bank and/or credit card accounts, Defendants shipped UD1S Products to Plaintiff in New York.

119. New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

120. Defendants engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, by misrepresenting that their UD1S Products were all analog and willfully failing to disclose that the UD1S Products were made using DSD technology, while persistently publishing marketing assertions (and omissions) to the contrary.

22

121.    Defendants knew or should have known that representing the UD1S Products as all analog was material and important to Plaintiff, class members, and reasonable consumers who were making choices about whether or not to purchase the UD1S Products.

122.    Defendants knew or should have known that the UD1S Products were not all analog because Defendants were aware that the UD1S Products were made using DSD technology.

123.    Despite knowing that the UD1S Products were not all analog, Defendants continued to market them as such.

124.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the all-analog nature of the UD1S Products.

125.    Defendants acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiff's and the other class members' rights. Defendants had actual knowledge in 2016 or earlier that the UD1S Products were not all analog but they continued to market them as all analog nonetheless.

126.    As a direct and proximate result of Defendants' deceptive and unlawful acts and practices, Plaintiff and the other class members suffered injury. Defendants deprived Plaintiff and the other class members of the benefit of the bargain. Plaintiff and the other class members have suffered and will continue to suffer injury, ascertainable losses of money, and monetary and non-monetary damages because Plaintiff and the other class members overpaid for the UD1S Products because they did not know the truth that the UD1S Products were made using DSD technology.

127.    Defendants' deceptive and unlawful acts and practices complained of herein affected all purchasers of the UD1S Products. The above deceptive and unlawful practices and acts by Defendants caused substantial injury to Plaintiff and the other class members that they could not reasonably avoid. Plaintiff and the other class members seek all monetary and non-monetary

23

relief allowed by law, including actual damages or statutory damages of $50 per violation (whichever is greater), treble damages, injunctive relief, and attorneys' fees and costs.

128.    Each time Defendants accepted a payment from Plaintiff and/or one or more of the other class members for a UD1S Product, Defendants committed a separate, independent, and willful violation of N.Y. Gen. Bus. Law § 349 through the above deceptive acts and practices in the conduct of its business.

129.    Defendants should, therefore, be assessed a separate statutory penalty of $50 for each independent violation, and all other such relief as may be just and proper should be recovered by Plaintiff individually and on behalf of the other class members.

### FIFTH CLAIM FOR RELIEF
**Violation of N.Y. Gen. Bus. Law § 350**
***Plaintiff, individually, and on behalf of all New York Subclass members***

130.    Plaintiff incorporates by reference herein the facts and allegations set forth in the foregoing paragraphs 1 through 89 as fully as though same were here set forth at length.

131.    Plaintiff brings this claim individually and on behalf of the other class members.

132.    Plaintiff has standing to bring this claim individually and on behalf of the other class members because the underlying transactions at issue between Plaintiff and Defendants happened entirely, or predominantly, in New York. Plaintiff was situated in New York when he purchased the UD1S Products. The representations at issue were directed towards Plaintiff in New York, and, in exchange for payments routed from Plaintiff's New York bank and/or credit card accounts, Defendants shipped UD1S Products to Plaintiff in New York.

133.    New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade, or commerce[.]" False advertising includes "advertising including labeling, of a commodity . . . if such advertising is misleading in a material respect,"

24

taking into account "the extent to which the advertising fails to reveal facts material in the light . . . representations [made] with respect to the commodity. . . ." N.Y. Gen. Bus. Law § 350-a.

134.    Defendants caused to be made or disseminated, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known, to Defendants to be untrue and misleading to consumers, including Plaintiff and the other class members.

135.    Defendants misrepresented that the UD1S Products were all analog on the labeling for the UD1S Products, through advertisements and marketing on their websites, and in formal and informal statements media and other public statements, and, at the same time, willfully failed to disclose that the UD1S Products were made using DSD technology.

136.    Defendants knew or should have known that representing the UD1S Products as all analog was material and important to Plaintiff, class members, and reasonable consumers who were making choices about whether or not to purchase the UD1S Products.

137.    Defendants knew or should have known that the UD1S Products were not all analog because Defendants were aware that the UD1S Products were made using DSD technology.

138.    Despite knowing that the UD1S Products were not all analog, Defendants continued to market them as such.

139.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the all-analog nature of the UD1S Products.

140.    Defendants have violated N.Y. Gen. Bus. Law § 350 because the misrepresentations and omissions regarding all analog nature of the UD1S Products were material and likely to deceive a reasonable consumer.

141.    As a direct and proximate result of Defendants' deceptive and unlawful acts and practices, Plaintiff and the other class members suffered injury. Defendants deprived Plaintiff and the other class members of the benefit of the bargain. Plaintiff and the other class members have suffered and will continue to suffer injury, ascertainable losses of money, and monetary and non-monetary damages because Plaintiff and the other class members overpaid for the UD1S Products because they did not know the truth that the UD1S Products were made using DSD technology.

142.    Defendants' false and misleading advertising complained of herein affected all purchasers of the UD1S Products. The above false and misleading advertising by Defendants caused substantial injury to Plaintiff and the other class members that they could not reasonably avoid. Plaintiff and the other class members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $500 per violation (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

143.    Defendants committed a separate and independent violation of N.Y. Gen. Bus. Law § 350 for each false advertisement pertaining or relating to the UD1S Products being all analog and/or not including digital technology.

144.    Defendants should, therefore, be assessed statutory damages of $500 for each such violation, and all other such relief as may be just and proper.

**SIXTH CLAIM FOR RELIEF**
**Fraud**
***Plaintiff, individually, and on behalf of all class members***

145.    Plaintiff incorporates by reference herein the facts and allegations set forth in the foregoing paragraphs as fully as though same were here set forth at length.

146.    As discussed above, Defendants made a number of materially misleading statements and/or omissions in the advertising, marketing, and sale of the UD1S Products, including:

a.    Using the term "One Step" to affirmatively misrepresent that the UD1S Products were pure analog recordings;

b.    Using the term "Original Master Recording" to affirmatively misrepresent that the UD1S Products were pure analog recordings;

c.    Stating that the UD1S Products were made using a proprietary mastering chain process called "GAIN 2™ Ultra Analog™ System for Vinyl" to affirmatively misrepresent that the Products were pure analog recordings;

d.    Failing to disclose that the UD1S Products were made using DSD technology;

147.    In deciding to purchase UD1S Products from Defendants, Plaintiff and the class reasonably relied on these misrepresentations and/or omissions to form the mistaken belief that their money was being accepted by Defendants in exchange for all analog vinyl records.

148.    Defendants' fraudulent conduct was knowing and intentional. The omissions and misrepresentations made by Defendants were intended to induce and actually induced Plaintiff and Class Members to purchase the UD1S Products as if they were all analog.

149.    Defendants' fraud caused damage to Plaintiff and the Class, who are entitled to damages and other legal and equitable relief as a result.

150.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## SEVENTH CLAIM FOR RELIEF
**Unjust Enrichment**

***Plaintiff, individually, and on behalf of all class members***

151.    Plaintiff incorporates by reference herein the facts and allegations set forth in the foregoing paragraphs as fully as though same were here set forth at length.

152.    Plaintiff and the class conferred benefits on Defendants by purchasing the UD1S Products at a premium price.

153.    Defendants have knowledge of its receipt of such benefits.

154.    Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff and class members' purchases of the UD1S Products.

155.    Defendants' retainer of these moneys under these circumstances is unjust and inequitable because Defendants falsely and misleadingly represented that the UD1S Products were all analog, but that is not true because they were made using DSD technology.

156.    Defendants' misrepresentations and material omissions have injured Plaintiff and class members because they would not have purchased (or paid a price premium) for the UD1S Products had they known the true facts regarding how the Products were made.

157.    Because it is unjust and inequitable for Defendants to retain such non-gratuitous benefits conferred on them by Plaintiff and the Class, Defendants must pay restitution to Plaintiff and the class as ordered by the Court.

## REQUESTED RELIEF

Plaintiff, individually and on behalf of the other class members, respectfully requests that the Court enter judgment in his favor and against Defendants as follows:

a.    Certifying the Class as requested herein, designating Plaintiff as class representative, and appointing the undersigned counsel as Class Counsel;

b.  Declaring that Defendants are financially responsible for notifying the class members of the pendency of this suit;

c.  Awarding statutory and/or actual damages to the maximum extent allowed, in an amount to be proven at trial;

d.  Requiring restitution and disgorgement of all profits and unjust enrichment Defendants obtained from Plaintiff and the other class members as a result of Defendants' unlawful, unfair, and/or fraudulent business practices;

e.  Awarding injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and ordering Defendants to engage in a corrective advertising campaign;

f.  Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

g.  Awarding pre- and post-judgment interest on any amounts awarded; and

h.  Awarding such other and further relief as may be just and proper.

### **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all causes of action so triable.

Dated: September 1, 2022

Respectfully submitted,

*/s/ Amy E. Keller*
Adam J. Levitt
Amy E. Keller
Michelle I. Locascio
**DiCELLO LEVITT LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: (312) 214-7900
Email: alevitt@dicellolevitt.com
        akeller@dicellolevitt.com
        mlocascio@dicellolevitt.com

Andrew B. Miller
**STAR AUSTIN & MILLER, LLP**
201 South 3rd Street
Logansport, Indiana  46947
Tel: (574) 722-6676
Email: miller@starrausten.com

Kenneth J. Grunfeld
Kevin W. Fay
**GOLOMB SPIRT GRUNFELD, P.C.**
1835 Market Street, Suite 2900
Philadelphia, PA 19102
Tel: (215) 985-9177
Email: kgrunfeld@golomblegal.com
        kfay@golomblegal.com

*Counsel for Plaintiff and the Putative Class
Members*